Is it good to go first or second, Mr. Elwood? It's good to go first this time. It's better to go second. At least I'm not here five times. Second's better. The odds are with you. That's true. Well, this afternoon I'm here on behalf of St. Anthony's. We're asking you to reverse the Commission's finding on a causal connection between the September 2010 work accident and the surgery that was performed in 2011. And really, this case is kind of interesting because to us, there's two different phases of this case. There's the Phase 1, which takes us from September 10 up until December when Dr. Gornett rendered his office note opinion with respect to the causation as to the symptoms she was experiencing. And Phase 2 would be from that date forward to the date of the surgery. And I think it's interesting to look at those two phases because certainly I think all the doctors here can see, whether it's Dr. Stanfield, the chiropractor, our IME, Dr. Matz, or Dr. Gornett, that she had originally suffered strain to her back at that point. And then in October she had an MRI film, an MRI study. And the interesting part about that is that it didn't show any stenosis. And it didn't show any impingement. She goes to Dr. Gornett, who she'd seen before for prior back problems in December. She presents a series of complaints to him. And he says at the time that the symptoms, I do believe her current symptoms are causally connected to her work-related injury of September 22, 2010. Now, you're probably saying, okay, so why isn't that the end of the discussion at this point? The reason that's not the end of the discussion is because we've got six months roughly later and a second CT with contrast that was performed in the spring, which shows the development of an annual tear at two levels and the development of stenosis, which was not present in the fall. And the surgical report from the 2011 surgery indicates that it relates to stenosis. Our IME offered an opinion that the procedures performed in the surgery were related to stenosis. The problem that we have is that the opinion here that was rendered by their physician, Dr. Gornett, was a snapshot in time prior to the surgery, prior to the films that showed the stenosis, and prior to obviously the operative report, which indicates stenosis. So the opinion that Dr. Gornett rendered in this case was based on what he saw at that time in December, which didn't include any findings of stenosis. Certainly she had some complaints that she related to him at that time, and he said the symptoms that she's complaining about are related to her accident. The problem that we have here is there's no medical opinion from Dr. Gornett that says the surgery that was performed on this lady, and I believe it was June of 2011 for the stenosis and the narrowing of the disc basis, was related to the accident in September. Did the symptoms change in the course of treatment? I think the course from the spring of 2011, I think she started to experience worsening of her symptoms. Well, and it's true, isn't it, that generally back surgeons decide to do surgery based upon the patient's ability to withstand the pain that they have. Oh, they can at times. I mean, they often leave it up to them, you know. That's absolutely true. And in his note of April 25, 2011, Gornett wrote to me that she was adamant that her pain and symptoms affect all aspects of her life and wished to proceed with the surgery.  The same symptoms that she had when he wrote his note, only worsening. Well, I went and looked at the records showing the visits following the December, and to me, I don't think the record fully develops the nature of the symptoms she was complaining about. I was looking at, I think it's the actual report you're talking about from that April timeframe where she was complaining to the doctor. There's no real crystallization of what she was complaining about at that time. I think the problem here is that the opinion that Dr. Gornett gave was based on an MRI that was done in the fall, and the condition changed sometime in that March-April timeframe. But he didn't actually limit his opinion solely to that MRI. I mean, his opinion that her current symptoms are causally connected to her work-related injury. No, it's based on her complaints. It's based on her history. Exactly. His examination, et cetera, et cetera. Exactly. Yes, that's true. And our point is that there's been a change between the conditions that the CT showed, excuse me, MRI showed in the fall, and the conditions that were represented on the CT in the spring. And when we asked our doctor what was the procedure that was performed, the operative procedure, he said this is for stenosis. There was no stenosis in the fall, but there's stenosis in the spring. So in that situation, it's our position that they were required to bring in their doctor and offer a letter, offer an opinion in some type of entry, or a deposition that said the surgery, the condition that was on the films in the spring is related to the accident. Yes, he made comments with respect to December, but things changed. Things changed, and the films changed. Where is that testimony? Why couldn't the commission infer from the overall course of treatment, and Dr. Gornitz notes that this was a continuous course of treatment. He opined that her symptoms were causally connected. He continued to treat her for those symptoms. He eventually, in the spring, said her options were to either live with it or have surgery. She opted for surgery. Why couldn't they infer that this was all involved in the same problem? Well, I think in an odd sense, the fact they had the films done in the spring, normally you'd think, well, you're going to take a test and find out what's exactly wrong with the individual. But I think in this particular case, that created a problem for them. Because had they not had that, you could perhaps make an inferment. Well, she was seen in December. Here's the doctor's opinions, and all we have is a continuation of the prior condition. But we've got a film that documents a definitive change, and we've got a surgical report that addresses what appeared on the films showing the change. And that's why we're saying that it was incumbent upon them to present a medical opinion to say, yes, those things that appeared in the spring, on the films in the spring, are also cause-related to the accident. Basically, an opinion part two. He's already got to December. He's talked about the condition and the symptoms he saw at the time. But where is the opinion that says that the changes that appeared in the spring and recorded on those films are related to the surgery? And they don't. And the only people in this case that went out and got an opinion was the respondent. And the employer got an IME. And the employer's IME says, no, that's a degenerative condition. It's stenosis. Stenosis wasn't present before the doctor rendered his opinion, and it is present afterwards. And that's what the surgery was for. And that's why we said they needed the doctor's opinion. Because had they not had the films in the spring, they would have a much better argument. I would agree with what you're saying. They would have a much more significant argument that it was just a continuation. And we wouldn't have any films to refute that. But we do have films here that refute that and say, we've got stenosis. That wasn't there before. It wasn't there before. So if it's not there before, where's the doctor's opinion to come in and say, you know what, that's included too, and to offer that explanation? How can the commission fill in that hole when we're talking about films that are different? This is that classic situation that we always pray for, before and after films. We have them here. This isn't us just making some argument. We've got before and after films that match up with a surgical report that relate to the second set of films that are after the original doctor's opinion. And our opinion says, not mine, our doctor's opinion says it's not related. So what we're saying here is that it was incumbent upon them to offer that medical opinion. Now, the ancillary of that is, could they rely on a chain of events? I don't think you can in this case. You can rely on a chain of events only to the extent that you could look at her condition. She had preexisting problems, certainly, that are documented prior to September. And if you want to rely on an opinion, you throw out whatever the doctor said in December and say, could a chain of events establish a causal connection with relation to what happened in December up until the films and up until December, excuse me, September and then up until December? Yes. But can you take that chain of events which requires a presupposition of a petitioner who is in a good state of health when she's clearly not based upon the strain that was diagnosed by three doctors in the films in the fall and the doctor's report from December? She's certainly not in a condition of good health and apply that. So we don't think chain of events is a viable theory in this case either. So that leaves them without an opinion. We have an opinion. So we think we should win. Thank you. Thank you, counsel. Counsel, you may respond. My name is Eric Kirkpatrick, and I represent the petitioner appellee. This is a manifest way to the evidence question. The commission found the petitioner's favor, and I don't think that there's a basis for this court to now reverse the commission's decision. You heard his argument. There's a gap in the evidence. Gornett did not testify after the original causation opinion, so how do you respond to his argument? Okay, I'll explain that. First of all, you are presupposing, Your Honor, that the two MRIs are different, and I will refer you to the first MRI and Dr. Gornett's first opinions in that first office note or so where he says, based on this MRI, I'm suspecting there's a disc problem at levels L2-3 and L3-4 based on that MRI. So he already has that opinion made that there are those disc problems based on that first MRI about the first time that he sees her. The second set of MRIs done by somebody totally different going off of a report and their IME's interpretation of it, really a close reading of that, it's no different. The issue was still at L2-3. The symptoms still came from L2, L3, L3, L4. They still came from those two disc levels confirmed by a discogram. And what we have, let's start here, we have before this accident a lady who had surgery in 2003 at L4-5, I believe. And that was done by Dr. Gornett. Done by Dr. Gornett, who returns to her regular duties, who does all of her regular duties, is able to continue working until this accident in 2010. Now let's go chronologically. Before she even saw Dr. Gornett, she had been through some conservative treatment that failed. She finally gets to Dr. Gornett. He suspects, based on an MRI that had already been done, this L2-3 and L3-L4 issue, he treats her conservatively. I think, and I could be incorrect, but I think that the discogram, I don't know what order they were done in. The second MRI comes back, still says the same thing about L2-3-4. The discogram confirms it. In the meantime, she's had injections. She's failed that. The conservative treatment failed. There is no difference in her symptoms, although, let me rephrase that, no difference in the location of her symptoms. There's worsening of her symptoms. The employer approves the surgery. The employer approves TTD, even though that's not an admission. I understand that. That's not where I'm going. But they approved all of this. And then later on, they get a Monday morning quarterback that comes in and says, oh, by the way, this was just a preexisting condition, and the surgery was for a degenerative condition and not something related to this accident. Well, first of all, I don't understand how you do that. The case was only disputed when it became ready to try. But secondly, if we look at Dr. Matz's deposition or his testimony, his report, you know, he even says, got it marked here in the, oh, it's page four of the commission's decision, and this is part of what the commission relied on. It says, when asked on cross-examination whether the lumbar strain he diagnosed when superimposed, this is the strain that Dr. Matz diagnosed, when superimposed on preexisting conditions could have caused those to become symptomatic, he testified that he expected for the stretching to have irritated the nerve. He would have expected the foramina to be critically tight. And then he agreed with Dr. Gornett's surgical report that noted that the foramen was released as it was compressing against the right side of the nerve. So that, that he indicated would be a necessary finding for him to have found that the strain even caused this to become more symptomatic was present in the operative report. As I said at the beginning of this, this is a question of the manifest way to the evidence, and there is plenty for the commission's decision to be upheld. Thank you, counsel. Counsel, you may reply. I just want to briefly address a comment counsel made with respect to Dr. Gornett already giving an opinion via his December medical entry that the L2-3, I think it was, level was causally related. The IME, our IME, offered an opinion based on the surgical report, and he said the surgery that was performed was for stenosis. The stenosis was shown in the films that the doctor did not see, that Dr. Gornett did not see. That's what your IME said. That's right. Okay, now the MRI, though, the original MRI did show possible lateral disc herniation at L3-L4 and a potential far lateral disc herniation at L2-L3, which Gornett said correlated with her symptoms. My recollection of the MRI report from the fall was that there was no herniation. Okay. I think that's what the record shows. Okay. And then Dr. Greg Cizek, C-I-Z-E-K, read the CT scan in April and found an abnormal L3-L4 disc, or I'm sorry, a mild partial anterior annular fiber tear at L2-L3 and an abnormal L3-L4 disc with at least grade 3 annular disruption. Okay. So same levels, same thing. And then the same day performed a discogram, which he said confirmed that. I mean, so we go back to the question I had earlier. I mean, why can't the commission look at this whole course of treatment? You know, you've got Dr. Gornett. He did the fusion that she had before, so he was familiar with her situation. Right. He comes along. She's got symptoms. You know, when he first examines her, he says this MRI shows L2-L3 possible annular tears at L2-L3, L3-L4. And he says all these symptoms are related to her accident. Six months later, the CT scan still shows potential annular disruption or tears at those same levels. He does surgery. But the tears weren't present. I mean, we're really kind of splitting hairs here. No, but the tears weren't present in the fall. When R.I.M.E. Gornett said they were. I don't recall that. In the MRI scan. I don't recall that. I don't recall anything about a tear. The tear appeared in the spring, and R.I.M.E. reviewed that in conjunction with the operating room. Well, herniation. Possible lateral disc herniation. That's very different than a tear. And the tear is a new thing, and that's why I say something changed in the spring. And the opinions that were given in December do not address those changes. And when the surgery, if the surgery's tied up, then bring in the doctor and have him offer the opinion, and none of us are here. But when we then counter that, what we view as a failure of proof, by getting an I.M.E. that says it's not related, and he explains it, then to counter that with nothing, it doesn't match the burden of proof. Well, it's no doubt if the commission would have said, we agree with the I.M.E., and we were up here, there would still be a problem on the standard of review if they believed him over Gornett, the treating physician. You'd be going second, which is better. I agree with that. I agree with that. But I think in that situation, we would have a bigger foundation, because our doctor did look at all the films when he offered his opinion, and I think that makes his opinion more credible. And I don't want to just make this deteriorate to just a credibility finding. I mean, you talked earlier in the prior case about foundation for the doctor's opinion. Here, I don't see where the foundation is for Dr. Gornett's opinion. Our doctor had a foundation. He reviewed everything, and he offered the opinion, and it wasn't countered. This woman had symptoms beginning with the accident in September of 2010. Did the symptoms ever lessen, according to her, up to the time of surgery? She says they didn't. I believe that was her testimony at arbitration. So her symptoms remain the same, although she testified that she only got a little achy feeling when she stood on concrete prior to the accident in September, and after the accident in September, she's testifying to pain radiating down her back that never subsides all the way to the surgery. Well, and that was part of my comment earlier when the bench asked about the medical records that show whether it continued in the spring. The medical records in the spring are not very clear. I don't think they really offer us a good insight, but we have to look and give significance to what those spring films show, and they show a change in her circumstances twofold, with the tear and with the stenosis, and they weren't there before, and the surgery unquestionably addresses the stenosis, and RME says the surgical procedure was performed for the stenosis. Thank you. I see I'm out of time. Thank you for your time. Thank you, counsel. Thank you, counsel, both, for your arguments in this matter. It will be taken under advisement, and a written disposition shall issue.